664 A.2d 587

**Stephen R. WOJDAK, Nicholas J. Maiale, Esquire, Personal Representative of Ludwig S. Capozzi, Jr., Deceased, Maurice C. Clifford, Patricia J. Clifford, Salvatore M. Debunda and Carol Debunda, Frank E. Devine, Teri Y. Doke, Domenic Falcone, Ruth W. Hayre, Samuel M. Merion, Martin D. Sellers, Dennis Sigovich**

v.

**GREATER PHILADELPHIA CABLEVISION, INC., General Partner of Greater Philadelphia Cablevision, L.P. and Greater Philadelphia Cablevision, L.P., Appellants.**

Superior Court of Pennsylvania.

Argued March 30, 1995.

Filed Aug. 25, 1995.

Antoinette R. Stone, Philadelphia, for appellants.

Howard A. Rosenthal, Philadelphia, for appellees.

Before BECK, TAMILIA and CERCONE, JJ.

BECK, Judge:

This is an appeal from a judgment entered on an order confirming an appraisal of limited partnership interests. Because the factual and procedural background giving rise to the issues presented is complex, we set it forth at length, as follows.

Appellant Greater Philadelphia Cablevision, L.P. (the "Partnership") is a limited partnership organized under the law of Delaware. The Partnership owns and operates a cable television system in Philadelphia. Appellant Greater Philadelphia Cablevision, Inc. (the "General Partner") is a Pennsylvania

corporation and is the general partner of the Partnership. Appellees, Stephen R. Wojdak, Nicholas J. Maiale, Esquire, Personal Representative of Ludwig S. Capozzi, Jr., Deceased, Maurice C. Clifford, Patricia J. Clifford, Salvatore M. Debunda, Carol Debunda, Frank E. Devine, Teri Y. Doke, Dominic Falcone, Ruth W. Hayre, Samuel W. Merion, Martin D. Sellers, and Dennis Sigovich (the "Limited Partners") are eleven of the twelve limited partners in the Partnership. They collectively originally owned 9.25% of the Partnership.

The General Partner and the Limited Partners are parties to a limited partnership agreement (the "Agreement") dated February 11, 1988. The Agreement gives the Limited Partners the right to sell their interests in the Partnership by "putting" to the General Partner or the Partnership (who are required to buy the offered interests) portions of the Limited Partners' interests during specified time periods. In January 1992 the Limited Partners "put" 50% of each of their interests, as permitted by the Agreement (the "Put Interests").

The General Partner and the Limited Partners were unable to agree on a price for the Put Interests. In May 1992 they commenced an appraisal under Section 9.5(e) of the Agreement, which provides for an appraisal by either an investment banking firm or a cable broker experienced in cable television. Section 9.5(e) further provides:

> In determining the purchase price for purposes of the Put and Call, the appraiser shall determine the fair market value of the Individual Interests being Put or Called, as of the September 30 immediately preceding the initiation of the Put or Call, using whatever valuation techniques he deems appropriate.... The Partnership, the General Partner and each Special Limited Partner and Transferee shall be finally bound by the decision of the appraiser.

In August 1992 the parties selected Waller Capital Corporation, an investment firm specializing in cable television, as the appraiser (the "Appraiser"). The Appraiser was retained pursuant to an agreement dated September 4, 1992 (the "Fee Agreement"). In September and October 1992 the Appraiser

gathered information about the Partnership's cable system (the "System"). On October 7, the General Partner and the Limited Partners made oral presentations to the Appraiser. Later in October 1992, the Appraiser sent a draft appraisal to the parties for their comment. The Appraiser determined the fair market value of the Put Interests as follows:

1. The Appraiser calculated the fair market value of the Partnership's System and adjusted this value to account for the Partnership's other assets and liabilities, thus yielding a fair market value of the Partnership as a whole.

2. The Appraiser then multiplied that amount by 4.625% to reflect the portion of the Partnership represented by the Put Interests.

3. The Appraiser determined that a discount should be applied to the value of the Put Interests because a buyer of those interests would have:

   a. no voice in the management of the Partnership;

   b. no liquid or efficient market in which to sell the Put Interests; and

   c. no means to realize the full value of the Put Interests until the termination of the Partnership under the terms of the Agreement, which would occur in 2015, or until the Partnership were sold to a third party.

Thus, the Appraiser applied a thirty-five percent (35%) discount to arrive at the final value of the Put Interests.

Both sides objected to the draft Appraisal. The Appraiser rejected both sides' objections and issued a Final Appraisal that was virtually the same as the draft. In explanation, the Appraiser stated that it continued to feel that lack of marketability and minority interest discount was appropriate based on its own research, which included consultation with "experienced cable television investors" and research into publicly traded cable stocks and other "limited partnership documentation." The final total value of all the Put Interests was determined to be approximately $2.6 million.

The Limited Partners immediately filed a petition to confirm the appraisal in part and to vacate it in part. They

objected only to the application of the discount to the Put Interests, and did not challenge the underlying valuation of the Partnership as a whole. Although the petition was filed in the Court of Common Pleas for Philadelphia County, both parties agreed and continue to agree that the dispute is governed by the substantive law of Delaware as provided in the Agreement. The Limited Partners contended that the application of a discount was substantively incorrect. They further argued that the appraisal had been procured by "undue means," as that phrase is used in the Delaware Arbitration Act, since the Appraiser had consulted with cable television investors other than the parties in gathering information concerning the appraisal.

By Memorandum Order dated February 1993, the trial court vacated the Appraisal only insofar as it applied the 35% discount. The court cited no precedent in support of its determination, which it justified as follows:

This Court ... must conclude that the appraisal was procedurally deficient. Consultation by the appraiser with unknown and unidentified cable television investors on the issue of valuation of the individual interests was inconsistent with the otherwise structured and open nature of the appraisal process. To do so subsequent to scheduled consultations with the parties relating to determination of value and without notice to them was so irregular and unforeseeable as to constitute "procurement by undue means."

Additionally, even the appraiser's substantive findings as to the fair market value of the individual interests appeared arbitrary and irrational. The application of a minority discount to the individual interests ... and only those interests after introduction of the concept of "full private market value" in devaluing those interests seems contrary to the law of the State of Delaware and without support in any provision of the partnership agreement itself or the fee agreement with the appraiser.

Trial Court Memorandum Order, 2/12/93, at pp. 2–3.

Following entry of this order there were several further procedural skirmishes between the parties in the trial court,

and several attempts by the Partnership and GPC to appeal the decision of the trial court to this court. All of these appeals were eventually quashed as having been taken from interlocutory orders. Finally, on January 19, 1994, the trial court instructed the parties jointly to request that the Appraiser issue a new appraisal that would be modified solely to eliminate the application of the 35% discount. The Appraiser complied with this request and the trial court ultimately issued an order confirming the modified appraisal and entered final judgment thereon. This timely appeal followed.

The Partnership and the General Partner raise the following issues on appeal:

1. Did the lower court err by not deferring to a binding determination of fair market value by an appraiser, who was an industry expert selected by the parties?

2. Did the lower court err by deciding that a determination of fair market value by an appraiser had been procured by "undue means" within the meaning of 10 Del.Code § 5714(a) because the appraiser relied in part on its own expertise and sources of industry information?

3. Did the lower court err by deciding that an industry expert's decision to apply minority and lack-of-marketability discounts in appraising minority limited partnership interests violated Delaware law and the agreements among the parties?

4. Did the lower court have authority to direct an appraiser to increase its determination of fair market value to conform to the lower court's view?

As in every case, the first issue is the proper standard of review to be applied in determining whether the trial court committed reversible error. Although, as we have noted earlier, all parties agree that the substantive law to be applied in this case is the law of the state of Delaware, nevertheless as a Pennsylvania appellate court reviewing the action of a Pennsylvania trial court, we must determine whether the trial court either abused its discretion or committed an error of law. *Hall v. Nationwide Mut. Ins. Co.*, 427 Pa.Super. 449, 629

A.2d 954 (1993). As to the substantive issues presented, we are in the unusual position of having to construe and apply the law of a sister jurisdiction, much as does a federal court sitting in diversity. In such cases, the federal courts are compelled to follow the decisions of the highest court of the state whose law is governing. If there is no ruling on the issue from the highest court, then the federal court must determine what the state's law is, giving due regard for the relevant rulings of the other courts in that state. *Northeast Financial Corp. v. Insur. Co. of North America*, 757 F.Supp. 381, 383 (D.Del. 1991). If the law of the state is unclear, the federal court must predict how the state's highest court would rule on the issue presented. *Id.* We have followed this model in analyzing the law of Delaware as it applies to the facts before us.

■ Since this is a case that fundamentally constitutes a challenge to an appraisal award that resulted from an appraisal conducted pursuant to a private agreement, the first substantive issue presented is the extent to which Delaware law permits judicial review of such an award. We have determined that such review is very limited. As the Partnership and the General Partner have correctly stated, under Delaware law a binding determination by a third party appraiser selected pursuant to a private agreement is basically the equivalent of arbitration, and judicial review thereof is governed by the Delaware Uniform Arbitration Act, 10 Del.Code §§ 5701 *et seq.* (the "Act"). *See Northeast Financial Corp. v. Insur. Co. of North America*, 757 F.Supp. 381, 384 (D.Del. 1991), citing *Closser v. Penn Mut. Fire Ins. Co.*, 457 A.2d 1081, 1087 (Del.1983). Since arbitration is favored by Delaware public policy as a speedy and efficient dispute resolution mechanism, a court is not permitted to interfere with the decision of the arbitrator based on a simple disagreement with the arbitrator's analysis of the merits of the issue. Rather, the award must be confirmed as long as it can rationally be derived from the parties' agreement or submission to the arbitrators and is not completely irrational. *See Northeast Financial, supra; Malekzadeh v. Wyshock*, 611 A.2d 18, 20–21 (Del.Ch.1992).

Although the trial court in this case did not expressly analyze Delaware law to determine the limits it placed on the court's review of the appraisal, the court appears to have relied primarily on one section of the Delaware Arbitration Act in rejecting the appraisal. The court stated that the appraisal was defective due to "procurement by undue means" and generally referred to the Act. Section 5714(a) of the Act states that the court will vacate an arbitration award where the award "was procured by corruption, fraud or other undue means." Here, the trial court concluded that the Appraiser's consultation with cable television investors without notice to the parties constituted procurement of the appraisal by undue means. The Limited Partners further argue that such consultation violates the Fee Agreement between the parties and the Appraiser, which states in section 2 thereof:

> There shall be no ex parte proceedings and neither Party shall discuss the Valuation with [the Appraiser] in the absence of the other Party. This policy shall not be interpreted to limit [the Appraiser's] access to the cable system or its employees and officers. Both Parties shall receive notice of any meeting or telephone calls between representatives of the cable system and [the Appraiser] and both Parties or their designees, shall be entitled to observe same or participate therein.

▮ Responding to the latter argument first, we do not interpret section 2 of the Fee Agreement as prohibiting the Appraiser from consulting with cable television investors outside of the cable television system owned and operated by the Partnership. The foregoing language clearly only prohibits contact by the Appraiser with one party to the Fee Agreement outside of the presence of the other party or contact with any representative of the Partnership's cable system outside of the presence of either party, if they wish to be present. This provision cannot fairly be interpreted to impose any limits on the conduct of the Appraiser in performing research and investigation through contact with other people who might be sources of valuable information concerning the proper valuation of the Put Interests.

■ We also reject the trial court's determination that the appraisal was the result of the use of "undue means." Although precedent on the meaning of the phrase "undue means" as used in an arbitration act is sparse, we conclude that the Supreme Court of Delaware would not find that the facts presented in this case rise to the level of undue means. Although the Delaware courts have not defined "undue means," other courts construing this language in their jurisdiction's arbitration act have noted that the statutory language itself, i.e. "corruption, fraud or *other* undue means," (emphasis added), suggests that the phrase "undue means" was intended to refer to conduct of the same general character as corruption or fraud. These cases suggest that "undue means" refers to conduct that is far outside the bounds of propriety. *See, e.g., Drayer v. Krasner,* 572 F.2d 348, 352 (2d Cir.1978), *cert. denied,* 436 U.S. 948, 98 S.Ct. 2855, 56 L.Ed.2d 791 (1978); *Shearson Hayden Stone, Inc. v. Liang,* 493 F.Supp. 104, 108 (N.D.Ill.1980), *aff'd,* 653 F.2d 310 (7th Cir.1981). Given the Delaware courts' public policy favoring arbitration, we believe those courts would define "undue means" in a similarly restrictive fashion.

■ Our examination of the record in this case reveals no such impropriety on the part of the Appraiser. Specifically, it is alleged that it was grossly improper for the Appraiser to consult with experienced cable television investors to determine whether minority and lack of marketability discounts were appropriately applied to interests like the Put Interests. After consulting with these persons, the Appraiser concluded that there were no investors that would be willing to buy interests of the character of the Put Interests at the time of valuation unless those interests were subject to a significant discount.

We disagree that this investigatory technique was improper. When private parties agree to be bound by private appraisal and further specify that the appraiser to be selected must have extensive expertise in the type of business interest the appraiser will be called upon to value, the parties are necessarily committing themselves to rely on that expertise. Part

of this expertise is the ability to identify what information is crucial to the task at hand and to amass that information. Here, the Appraiser relied, of course, on a great deal of information concerning the Partnership and the cable television system it operated which was provided by the parties themselves. The Appraiser also relied, however, on its general knowledge of and experience in the valuation of business interests of this sort. This knowledge and experience led the Appraiser to believe that it was necessary for it to investigate whether lack of marketability and minority interest discounts were appropriate by consulting with investors who potentially would have information pertinent to that question. After having done so, the Appraiser issued a draft appraisal reflecting its application of such discounts. Each party was then permitted to comment on the draft appraisal before the final appraisal was issued. Thus, the Limited Partners had a full opportunity to express their opposition to the application of the discounts. We see no impropriety whatsoever in this approach. It certainly cannot be regarded as the type of conduct the Supreme Court of Delaware would consider to be "undue means."

■ The only other grounds provided by the trial court for its partial vacation of the appraisal insofar as minority and lack of marketability discounts had been applied was that the appraisal "appeared arbitrary and irrational," and "seems contrary to the law of the State of Delaware and without support in any provision of the partnership agreement itself or the fee agreement with the appraiser." The court cited no precedent or other authority in support of these conclusions.

After a careful review of the conduct of the Appraiser in this matter and of the agreements pursuant to which the appraisal was conducted, we find no basis for concluding that a Delaware court would deem the Appraiser's actions to be inconsistent with the parties' agreements or their submission to the Appraiser. Under Delaware law, a party moving to vacate an arbitration award on the ground that the arbitrator exceeded his powers under the submission to him must demonstrate that the arbitrator did so by strong and convincing

evidence. *Malekzadeh v. Wyshock, supra,* 611 A.2d at 21. In this case, the Partnership Agreement charged the Appraiser with determining the fair market value of the Put Interests. The Agreement defined "fair market value" as "the price at which a willing seller would sell and a willing buyer would buy [the Put Interests] ... in an arm's-length transaction without time constraints." As the Partnership and General Partner persuasively argue, in arriving at fair market value of a business interest, it is well-established that there are situations where minority and lack of marketability discounts are appropriate. *See generally* Shannon Pratt, *Valuing a Business* (1989); Raymond C. Miles, *Basic Business Appraisal* (1984). Nothing in the parties' agreements removes from the Appraiser the authority to make this determination one component of appraising the fair market value of the Put Interests. In fact, section 9.5 of the Partnership Agreement expressly directs that the Appraiser may determine what valuation techniques it will use.

Moreover, there is no indication that a Delaware court would deem the Appraiser's actions completely irrational and contrary to law. We reiterate that in reviewing the actions of the Appraiser, we do not inquire merely whether we agree with the Appraiser's ultimate conclusions, but rather whether the Appraiser so far exceeded the terms of the submission to it or acted in such a patently unreasonable manner as to justify the interference of the court. As the foregoing discussion demonstrates, it was not at all irrational for the Appraiser to apply the discounts it did and neither the trial court nor the Limited Partners have cited a single Delaware authority standing for the proposition that the valuation techniques used by the Appraiser violate Delaware law. Although the Limited Partners argue at great length that the use of lack of marketability and minority discounts violates the principles set forth in Delaware case law regarding appraisal of business interests, the authorities on which they rely largely address statutory stock appraisal proceedings conducted under the Delaware stock appraisal statute, 8 Del.Code § 262.

In sum, on the basis of the record before us, and applying the standards established by Delaware law, we find no basis for vacating the Final Appraisal originally submitted by the Appraiser. The trial court erred in refusing to confirm that appraisal, directing that it be modified to remove the discounts originally applied, and ultimately confirming the modified appraisal from which those discounts had been removed. Therefore, we reverse the judgment of the trial court and remand for confirmation of and entry of judgment on the Final Appraisal as originally submitted by the Appraiser.

Judgment reversed; case remanded for further proceedings consistent with this opinion; jurisdiction relinquished.