IN RE the MARRIAGE OF: Ara Lee ARNESON,
Petitioner-Appellant and Cross-Respondent,

v.

John W. ARNESON, Respondent and Cross-Appellant.

Court of Appeals

*No. 82–2305. Argued May 7, 1984.—Decided June 13, 1984.*
(Also reported in 355 N.W.2d 16.)

238

For the appellant and cross-respondent, there were briefs by *Schoone, McManus, Hankel & Ware, S.C.,* with *Kent A. Tess-Mattner* of counsel, of Racine. Oral argument by *Adrian P. Schoone.*

For the respondent and cross-appellant, there were briefs and oral argument by *Donald J. Bauhs, Wilbur W. Warren III* of counsel, of Kenosha.

Before Scott, C.J., Brown, P.J., and Nettesheim, J.

NETTESHEIM, J. This is an appeal and cross-appeal from the terms of a judgment of divorce awarded to the petitioner (Ara Lee) against the respondent (John). The issues involved are: (1) determination of the marital estate; (2) valuation of the marital estate; (3) division of the marital estate; (4) denial of maintenance to Ara Lee, and (5) contribution to Ara Lee's attorney's

fees relative to proceedings in the trial court and on this appeal.

The parties were married in 1963 when Ara Lee was twenty-four and John was twenty-six. During the marriage, Ara Lee maintained employment, on either a fulltime or parttime basis, in clerical and sales-related positions. John came within one credit of graduating from college and began working fulltime with the Arneson Foundry in 1959. He has maintained fulltime employment at the foundry ever since. During the course of the marriage, John has attained the positions of corporate vice president, treasurer, and director of Arneson Foundry. The parties do not have any children. Additional facts of the case and specifics of the trial court's decision will be referred to as the discussion of each issue requires.

## DETERMINATION OF MARITAL ESTATE

### "Fruits" of the Arneson Foundry Stock

At the time of the divorce, 750 shares of Arneson Foundry Corporation stock were outstanding. These shares were owned in equal 250-share amounts by John, his brother James, and his cousin Richard. Of John's 250 shares, the trial court properly excluded from the marital estate 100 shares gifted to John by his father. Other lesser amounts of non-Arneson property inherited by John were also excluded from the marital estate. The propriety of these exclusions is not at issue on this appeal.

The trial court valued the Arneson Foundry stock at $3,750 per share, placing the value of the stock included in the marital estate at $562,500. The trial court then awarded Ara Lee one-third of this value, or $187,500. The propriety of this valuation and the one-third award

to Ara Lee will be discussed in a later portion of this decision.

Following the above calculations, the trial court noted that other assets of the marital estate had been purchased with the "fruits" of John's inherited and gifted property.[1] Since the gifted and inherited property was properly excluded from the marital estate, the trial court reasoned that other property purchased with the dividend income generated by the excluded property should also be excluded.[2] Since forty percent (100 shares) of John's Arneson stock was excluded as gifted property, the trial court determined that an approximate similar amount (thirty-five percent) representing property purchased from the "fruits" of the gifted Arneson stock should be excluded from the *remaining* estate.[3]

[1] The trial court's decision equates "fruits" with income generated by the Arneson Foundry stock holdings.

[2] These dividends have been substantial over the past ten years, rising to a level of $800 per share in 1981. John executed promissory notes to the corporation as payment for his purchases of Arneson Foundry stock. These notes promised application of the dividends in payment for the stock. After 1973, these dividends exceeded the payments due on the notes.

[3] The actual figure utilized by the trial court was thirty-five percent. The five percent reduction from forty percent was explained by the trial court as follows:

[A]s stated previously, forty percent of respondent's stock was given to him by his father. Further, the Court must consider that not all of the money, generated by whatever source, went into investments, and that all the investments were not equally successful. The parties had to live (albeit somewhat modestly, considering the income involved, but at the same time substantially, considering today's cost of living, and their purchases of the various luxurious items of personal property), therefore, there were funds expended for this purpose. Conservatively then, 35 percent of $419,980 in United States Government bonds, and $206,550 in tax-exempt bonds, less $19,001, and $28,398, which was awarded to the respondent above, or a total of $579,131, were generated by or through personal property inherited or gifted to the respondent, and commingled with the marital property.

The trial court utilized the values assigned to United States government bonds and certain tax-exempt bonds for purposes of effectuating this further exclusion. These items were valued at $579,131 after crediting John with two items of personal property previously awarded. Of this amount, $202,696 (thirty-five percent) was accordingly excluded from the marital estate. The balance of $376,435 was then subjected to the same division as applied to the included Arneson Foundry stock—one-third to Ara Lee and two-thirds to John.

Ara Lee argues that the exclusion of property purchased by the dividend income of the Arneson Foundry stock was improper. There is a dearth of authority, both in this state and elsewhere, on this question.[4]

We have recently held that the appreciated value of a nonmarital gift is to be regarded as nonmarital property where the appreciation is due to general economic conditions of inflation, normal appreciation of real estate, and where the nonowning spouse did not make contributions occasioning the appreciation in value. *Plachta v. Plachta*, 118 Wis. 2d 329, 348 N.W.2d 193 (Ct. App. 1984). The issue in the instant case moves beyond *Plachta* and presents the question of whether other property purchased with the dividend income generated by an excluded asset should also be excluded from the marital estate.[5]

The issue is one of statutory construction of the following language of sec. 767.255, Stats.:

Any property shown to have been acquired by either party prior to or during the course of the marriage as a gift, bequest, devise or inheritance or to have been

---

[4] For this reason, we certified this case to the supreme court on January 4, 1984. Certification, however, was denied on February 7, 1984.

[5] The asset involved in *Plachta* was a home gifted to one of the parties during the marriage.

paid for by either party with funds so acquired shall remain the property of such party and may not be subjected to a property division under this section except upon a finding that refusal to divide such property will create a hardship on the other party . . . .

*Plachta* implies that sec. 767.255 is ambiguous because it is silent as to the treatment of appreciation of inherited or gifted property. We do not necessarily agree that the statute is ambiguous—at least as it applies to the facts of this case. A plain reading of the statute satisfies us that property acquired with income generated by an excluded asset is not excluded from the marital estate. However, even following the rule of *Plachta,* construing the statute as ambiguous, and applying the rules of statutory construction, we are all the more convinced that such property is included in a marital estate.

Statutory construction is a question of law, and we need not defer to a trial court's conclusion. *Plachta* at 332, 348 N.W.2d at 195. In construing a statute, the primary source is the language of the statute itself. *Wisconsin's Environmental Decade, Inc. v. Public Service Commission,* 81 Wis. 2d 344, 350, 260 N.W.2d 712, 715 (1978). The entire section of a statute and related sections are to be considered in its construction or interpretation. *Omernik v. State,* 64 Wis. 2d 6, 12, 218 N.W. 2d 734, 738 (1974). In determining the meaning of any single phrase or word in a statute, it is necessary to view it in the light of the entire statute. *State ex rel. Tilkens v. Board of Trustees of Firemen's Pension Fund,* 253 Wis. 371, 373, 34 N.W.2d 248, 249 (1948).

Wisconsin recognizes a married person's right to continue to own his or her sole and separate property. *Plachta,* 118 Wis. 2d at 333, 348 N.W.2d at 195. *Plachta* concludes that nothing in ch. 767, Stats., indicates that an appreciation in value of nonmarital property somehow renders it marital property. *Id.* We similarly conclude

that nothing in ch. 767 indicates that property *not* acquired by any of the means recited in the statute (gift, bequest, devise or inheritance) should be excluded because the purchase moneys were income generated by an asset entitled to such exclusionary status. To exclude appreciation in value of an asset expressly excluded by the statute, as *Plachta* mandates, is a logical interpretation of the statute. However, to extend such exclusion to assets not expressly covered by the statute represents an unwarranted judicial intrusion into matters more properly left to the legislature.

*Plachta* holds:

Without an express statutory provision to the contrary, assets that are separate property retain that identity and are generally not subject to property division regardless of appreciation or depreciation in value.

*Id.* Here, the income obviously was not in existence at the time of the gifting of the principal asset. Furthermore, the subsequently earned income has been converted to different property in the form of U.S. government bonds and other tax-exempt bonds. The mere fact that the existence of this subsequently purchased property can be traced to income generated by the gifted property does not serve to undo the legislative intent manifested by the language of sec. 767.255, Stats., which extends exclusion only to property acquired by the means recited therein. It is proper for the legislature to extend the parameters of excluded property to the limits asserted by John in this case.

For purposes of determining the components of a marital estate, we view income generated by an asset as separate and distinct from the asset itself. We also view such income separate and distinct from the appreciation of the asset itself. We see nothing in the developing Wisconsin law excluding appreciation of gifted or inherited

property from a marital estate as mandating that property purchased with the income from such property also be excluded.

The only property accorded exclusionary status under sec. 767.255, Stats., is that (1) acquired by gift, bequest, devise or inheritance, or (2) paid for with funds so acquired. The income generated by the excluded Arneson Foundry stock obviously was not acquired by gift, bequest, devise or inheritance. Nor was it paid for with funds so acquired since income is not purchased—it is earned. The bonds, the value of which were partially excluded from the marital estate by the trial court as "fruits" of the Arneson stock, were not *directly acquired* by any of the statutory means nor were they *purchased with funds acquired* by such means.

We therefore reverse the ruling of the trial court which excluded that portion of the value of the U.S. government bonds and tax-exempt bonds attributed as "fruits" of the Arneson Foundry stock and remand with directions to include such assets in the marital estate.[6]

Property of Ara Lee Brought into the Marriage

The trial court found that Ara Lee contributed $13,000 in premarital assets to the marriage. Part of this cash contribution went towards the purchase of the marital homestead. The property division accomplished a return of this contribution to Ara Lee. She argues that, if the

---

[6] In some cases, income generated by excluded assets does not pass through the hands of the owner for purposes of further use or reinvestment. Also, certain other income or dividend plans do not vest control in the owner over such property, or the investment, reinvestment, or other spending decisions. We do not determine whether the rationale of this decision should extend to such situations.

trial court intended to exclude property brought into the marriage, the appreciation on this property should be similarly excluded. We do not read the trial court's ruling, however, as an exclusion of Ara Lee's contribution from the marital estate. Rather, we interpret the trial court's treatment of this property as but an influencing factor on the larger question of the ultimate property division. *See* sec. 767.255(2), Stats. The trial court did not recite that Ara Lee's contribution to the marriage was excluded. Although the practical effect of the court's treatment of this matter was to return her contribution to her, this was but one relatively small component of a much larger property division.

Nothing in *Plachta* suggests that its rationale should apply to property brought to the marriage by either party. The premise of *Plachta* is that the property is excluded by statute in the first instance. It does not apply to nongifted and noninherited property brought to a marriage by either party. We therefore reject any claim by Ara Lee that her property brought to the marriage, and appreciation thereon, should have been excluded or otherwise awarded to her.

### Division of John's Pension Plan

Ara Lee contends that the trial court erred in failing to *divide* John's pension plan. The trial court awarded John "all right, title, and interest to his pension at Arneson Foundry . . . ." As with the return to Ara Lee of her property brought into the marriage, the award to John of his pension plan was but one component of a much larger property division. Pursuant to sec. 767.255, Stats., the obligation of the court is to divide the property of the parties. We do not read this language to mandate a separate division (and perhaps liquidation) of

each marital asset. The landmark case of *Bloomer v. Bloomer*, 84 Wis. 2d 124, 267 N.W.2d 235 (1978), which initially described the appropriate methods of pension plan valuation, retained discretion in the trial court as to the mechanics of property division by stating:

None of what we have said detracts from the fact that the trial court *retains broad discretion in valuing pension rights and in dividing them between the parties.*

*Id.* at 134, 267 N.W.2d at 240 (emphasis added).

We agree with John's assertion that the property division must be viewed as a whole in order to determine its equity. Perhaps, in most cases, because the pension plan will represent one of the more valuable assets of the marital estate, it is specifically divided by the trial court. This is not mandatory however. Where other assets far exceed the value of the pension plan, it is not unreasonable to award the plan *in toto* to the owner as part of his or her share of the property division.[7] We therefore reject Ara Lee's claim that the trial court erred in not

---

[7] If the thrust of Ara Lee's argument on this issue is that the trial court should have determined a fixed percentage of any future payments under John's pension plan attributable to earnings during the marriage (an acceptable method under *Bloomer*), we conclude our suggestions in *Holbrook v. Holbrook*, 103 Wis. 2d 327, 309 N.W.2d 343 (Ct. App. 1981), are appropriate:

We believe that a trial court should be particularly alert to the advantages of dividing retirement benefits at the time of divorce rather than postponing the actual division for a number of years until the employee-spouse actually retires. . . . We believe that where there are sufficient assets available at the time of divorce to divide the present value of the retirement benefit without causing an undue hardship on either spouse, this method is preferred.

*Id.* at 340, 309 N.W.2d at 349. In the case at bar, there obviously are other sufficient assets available to offset the awarding of the value of the pension plan to John.

awarding her a specific interest in John's pension plan. To the contrary, we conclude that the trial court expressly considered this asset in dividing the marital estate.

## VALUATION OF THE MARITAL ESTATE

### Arneson Foundry Stock

Both parties appeal the trial court's valuation of John's Arneson Foundry stock. Ara Lee claims the trial court erroneously applied a twenty-five percent minority and nonmarketability discount factor to the valuation. She argues that application of any discount factor is inappropriate. John argues that the twenty-five percent discount factor utilized by the trial court is contrary to the great weight and clear preponderance of the evidence. He further contends that a greater discount factor should have been applied.

At the time of the divorce, 750 shares of Arneson Foundry corporation stock were outstanding and owned in equal one-third amounts by John, James and Richard. The trial court construed John's holdings as a minority share of a closed corporation.

An appellate court will not disturb a trial court's decision on the valuation of a closed corporation unless it is contrary to the great weight and clear preponderance of the evidence. *Dean v. Dean*, 87 Wis. 2d 854, 876, 275 N.W.2d 902, 912 (1979). Stated otherwise, in actions tried without a jury, findings of fact shall not be set aside unless clearly erroneous. Sec. 805.17 (2), Stats. A trial court in a divorce action is not required to accept any one method of stock valuation as more accurate than another accounting procedure. *Id.* at 875–76, 275 N.W.2d at 912.

A trial court is free to assess expert opinion and determine fair market value in light of testimony regard-

ing: the nature of the business, the corporation's fixed and liquid assets at the actual or book value, the corporation's net worth, *the marketability of the shares,* past earnings or losses and future earning potential.

*Id.* at 876, 275 N.W.2d at 912. (Emphasis added; footnotes omitted).

Although the evidence demonstrated a history of cooperation and accord among the shareholders, the trial court was not obligated to conclude that this congenial state of affairs would endure. The inescapable fact is that John's holdings constitute a minority portion of the outstanding stock. The trial court's finding to this effect is certainly not clearly erroneous. The application of the twenty-five percent discount factor for minority status and nonmarketability is supported by certain of the expert testimony in this case. Just as the determination of the true market value of the stock of a closed corporation may lie somewhere between the extremes in value testified to by two experts, *Estate of Gooding,* 269 Wis. 496, 512–14, 69 N.W.2d 586, 594–95 (1955), so also may the selection of a discount factor lie somewhere between the extremes suggested.

Ara Lee contends that the generous dividends paid on the Arneson Foundry stock should negate any considerations for minority status and nonmarketability. She also suggests that a premium on the assigned value might be more appropriate in the light of these dividend payments. We acknowledge the attractive level of the dividend payments but observe that expert testimony nonetheless opined that a discount factor was appropriate. No guarantee existed that the favorable dividend levels would be maintained. Clearly, they could be altered or terminated over the dissenting voice of a minority stockholder. The adoption of a twenty-five percent discount

factor for minority status and nonmarketability is supported by the evidence and is not clearly erroneous.

John also contends that the terms of a buy-sell agreement between himself and Arneson Foundry dated December 12, 1980 should govern as to the valuation of his Arneson stock holdings. We recognize that *In re Estate of Weber*, 86 Wis. 2d 151, 271 N.W.2d 657 (1978), states:

> We hold that under the facts of this case as stipulated by the parties that where a closely held corporation and a minority shareholder enter into an arm's length agreement binding the corporation to purchase and the shareholder (or his assignee) to sell his stock at a *specified price* at the shareholder's death, and the restriction is indicated on the face of the stock there is a presumption raised that the amount agreed upon is the market value of the stock at the time of death.

*Id.* at 159, 271 N.W.2d at 661 (emphasis added). *Weber,* however, is an inheritance tax case in which the holding is expressly limited to the facts of that case as stipulated by the parties. In addition, the *Weber* stock redemption agreement provided that the consideration for the purchase was to be made up of three items: (1) a certain parcel of real estate together with all personal property therein or if the corporation did not own the real estate at the time of the purchase, the sum of $100,000; (2) $20,000 in cash, and (3) $180,000 payable in fixed annual installments with the unpaid principal to bear interest. These terms clearly met the "specified price" requirements of *Weber.*

The buy-sell agreement in the instant case does not fix a specified price, but rather prescribes an ongoing process for determination and adjustment of the price at the annual meeting of the shareholders or any special meeting called for that purpose. We therefore do not conclude that the presumption mandated in *Weber* for

inheritance tax purposes in an estate proceeding applies in the case at bar. Rather, we conclude that the valuation of the Arneson Foundry stock and the discount factor applied thereto for considerations of minority interest and nonmarketability are not clearly erroneous.

## John's Pension Plan

The trial court awarded John all "right, title and interest to his pension at Arneson Foundry, which the Court finds to have a present value of $30,242." This finding is in accord with the testimony of William Lunsden, a consulting actuary. Mr. Lunsden also testified that if John continued employment at Arneson to age sixty-five, the present value of his pension would be $57,351. Ara Lee argues that the latter figure is the proper valuation figure for John's pension plan. We disagree. Such a holding would be based entirely upon the assumption that John would continue his Arneson employment to age sixty-five. It further would effectively award pension funds increased by virtue of John's postdivorce employment with Arneson.

Ara Lee argues, however, that this computation of present value is necessary under the third valuation method mandated by *Bloomer*. She is incorrect. This method allows the trial court to determine a fixed percentage of any future payments under the employee-spouse's pension plan attributable to earnings during the marriage to which the nonemployee spouse is entitled. *However, this method requires no calculation of present value. Holbrook v. Holbrook,* 103 Wis. 2d 327, 339, 309 N.W.2d 343, 349 (Ct. App. 1981). We conclude that the trial court's valuation of John's pension plan is within the mandates of *Bloomer* and is not clearly erroneous.

### Ara Lee's Personal Property

The trial court's valuation of Ara Lee's silver pieces, furs, china, crystal and jewelry adopted the testimony of the parties' insurance agent who indicated that these values were replacement values. The use of this valuation method was error. That fair market value is the proper method of valuing property for purposes of divorce has been treated as a given by the appellate courts of this state. *Corliss v. Corliss,* 107 Wis. 2d 338, 345, 320 N.W.2d 219, 222 (Ct. App. 1982).

John contends that Ara Lee was not competent to testify as to the value of her personal property and thus the trial court could not have adopted her figures in any event. However, an owner is competent to give opinion evidence as to value of his own property. *Wilberscheid v. Wilberscheid,* 77 Wis. 2d 40, 48, 252 N.W.2d 76, 81 (1977). We therefore vacate the trial court's value findings as to these items of Ara Lee's personal possessions and direct, on remand, that these determinations be premised on the fair market value of the property.

## DIVISION OF MARITAL ESTATE

The trial court awarded one-third of the value of the 150 shares of Arneson Foundry stock properly included in the marital estate to Ara Lee. The shares themselves were awarded to John. One-third of the value of the "fruits" of the Arneson Foundry stock which the trial court retained in the marital estate was similarly awarded to Ara Lee.[8]

---

[8] These two awards constitute the bulk of the property division to Ara Lee. The addition of the remaining items awarded to Ara Lee places the property division at an approximately sixty percent/forty percent division in favor of John.

In making the unequal property division in favor of John, the trial court relied on John's "heir apparent" status to the fortunes of the Arneson Foundry. The trial court observed:

[n]either the respondent or the petitioner at the time of marriage had much property [in comparison to the marital estate now], and therefore could not bring much into same. Yet the respondent was not without portfolio. Whereas he did not have much property in a material sense, he was an heir apparent to the fortunes of Arneson Foundry, and that heirship has materialized into substantial assets indeed. . . . With all due respect to both parties herein, and not disparaging petitioner's efforts as a homemaker, nor respondent's efforts as an able employee and officer at the foundry, the fact that they intermarried did not have a great deal to do with the success of Arneson Foundry. In other words, with or without the marriage, Arneson Foundry would be about the same success today.

In making this ruling, the trial court invoked the provisions of sec. 767.255(12), Stats., the "catch-all" provision of the property division statute which allows a court to consider, in addition to those factors specifically enumerated, "[s]uch other factors as the court may in each individual case determine to be relevant." Although the trial court's decision collaterally addresses some of the other factors recited in sec. 767.255(1) through (11), the basis for the unequal division explicitly rests on John's "heir apparent" status to the fortunes of the Arneson Foundry.

The remand mandated by our holdings herein will require an adjustment to the marital estate and a reevaluation of certain of its assets. Of necessity, the factors recited in sec. 767.255(1) through (12), Stats., bearing upon an unequal property division, will also be changed. Since the trial court will be required to make a new determination as to the property division, we are not re-

quired to squarely address the propriety of the now-vacated former division.

However, we do not accept John's argument that all relevant factors were reviewed by the court in the division of the marital estate. To the contrary, it appears that the trial court only considered subsections (2) and (12) as bearing upon the property division. We recognize that the trial court need not consider *all* of the twelve factors recited in the statute. *Herlitzke v. Herlitzke,* 102 Wis. 2d 490, 495, 307 N.W.2d 307, 310 (Ct. App. 1981). However, neither may the trial court ignore those factors which are clearly relevant. *In re the Marriage of Lundberg,* 107 Wis. 2d 1, 11–12, 318 N.W.2d 918, 923 (1982).

The trial court's references to subsections (3)—contribution of each party to the marriage; (8)—maintenance payments; (9)—other economic circumstances of each party, including pension benefits, and (10)—tax consequences indicate that these factors were considered relevant. We agree. However, the trial court did not explain their effect upon the unequal property division. Appellate review of discretionary decisions is virtually impossible where there is no record of the trial court's reasoning in reaching a particular conclusion. *Holbrook* at 339–40, 309 N.W.2d at 349. The exercise of discretion requires a reasoning process dependent on facts in, or reasonable inferences from, the record and a conclusion based on proper legal standards. *Id.* at 340, 309 N.W.2d at 349.

We stress that we do not hold that the approximate sixty percent/forty percent division necessarily constitutes an abuse of discretion. Nor are we prepared to state that John's "heir apparent" status is necessarily an improper factor for the trial court to consider under

sec. 767.255(12), Stats. While the trial court's decision discusses the relevancy of John's "heir apparent" status, an explanation as to how or why it warrants deviating from the statutory presumption of an equal property division would be desirable. A similar discussion as to how the other relevant factors under the statute affected the property division would also be of assistance.

## MAINTENANCE

Since a determination as to maintenance, if any, and the amount is influenced by the property division and since the property division in this case must be redetermined, we remand for further consideration of Ara Lee's claim for maintenance.

## ATTORNEY'S FEES CONTRIBUTION

Based on the property division awards to each, the trial court ordered each party to pay his respective attorney's fees. We question whether this constitutes the requisite findings of need and ability. *Selchert v. Selchert*, 90 Wis. 2d 1, 15, 280 N.W.2d 293, 300 (Ct. App. 1979). However, the proceedings upon remand will further bear upon Ara Lee's need for contribution to her attorney's fees and both parties' ability to pay. We also direct, upon remand, that the trial court receive evidence and make findings relative to the reasonableness of the fees for the prosecution of this appeal, Ara Lee's need for contribution thereto, and the parties' ability to pay.

Costs are denied to both parties.

*By the Court.*—Judgment affirmed in part, reversed in part and remanded for further proceedings consistent with this decision.